Filed 1/27/22  P. v. Jones CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C091914 |
| Plaintiff and Respondent, | (Super. Ct. No. 19F1956) |
| v. | |
| JACOB CALVIN JONES, | |
| Defendant and Appellant. | |

Defendant Jacob Calvin Jones was convicted of multiple charges arising from an altercation with two victims, including attempted murder and two charges of assault with a firearm.  On appeal, defendant contends the evidence was insufficient to support his conviction of assault with a semiautomatic firearm on one of the victims.  He also contends his counsel was ineffective and that the trial court abused its discretion in failing to strike the firearm enhancement imposed under Penal Code section 12022.53, subdivision (d).[1]

---

[1]   Undesignated statutory references are to the Penal Code.

Upon review of the record, we discovered a discrepancy between the trial court's oral pronouncement of judgment and the abstract of judgment with regard to the fines and fees imposed. We affirm but order the trial court to correct the abstract of judgment to reflect the fines and fees imposed.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Testimony from Allan L.*

During the February 2020 trial, Allan L. testified that on the morning of March 23, 2019, he was at the home of his then-girlfriend Cheyenne W. He and Cheyenne had known each other for seven years. Cheyenne lived with her mother Erin M., who also was there that morning Allan drank four to six shots of vodka, ingested cocaine, and smoked marijuana with the family. At some point, a third man joined in, but he eventually left the home.

Defendant arrived around 7:00 that evening. This was the first time Allan had met defendant. They played dominoes and ate. Around 3:00 a.m., defendant and Allan talked alone in the kitchen for five to ten minutes about love. Although their conversation was "calm," the two men ended the conversation in disagreement. Defendant seemed a little agitated as he walked outside to the back porch, where Erin and Cheyenne were sitting. Allan saw defendant suddenly push Erin and knock her over in her chair. Erin was able to get up. Defendant then put his cigarette out on Cheyenne's neck and knocked her to the ground by hitting her on the side of her head with his open hand.

Allan rushed to protect the women as defendant began stomping on Cheyenne. Allan got down on the ground for about a minute to shield Cheyenne with his body, and he kicked at defendant to try to block further hits. Meanwhile, Cheyenne tried to get away, and Erin stood nearby and watched. Allan helped Cheyenne get up, and defendant went into the house. When defendant returned 20 seconds later, he had a gun that looked like an AR-15 rifle. Allan placed himself between defendant and the two women, and

2

tried to convince defendant to put the gun down. Defendant said, "No, it's past that," and, "[T]his is what he has to do." Allan did not see defendant shoot at anyone or hit anyone with the gun. A minute passed, and defendant returned inside the home.

Allan spent 30 seconds gathering his things from the back porch and kitchen, and then tried to leave with Cheyenne. He picked up Cheyenne and carried her to the front door. Before they could get outside, defendant appeared with another gun that looked like a Glock .45-caliber pistol (Glock pistol). Defendant waved the gun around and pointed it at Allan and Cheyenne. During cross-examination, Allan testified that he did not see defendant hit anyone with the pistol. However, during redirect, Allan testified that, at some point, he saw defendant hit Erin on the side of the head with the "butt of the gun." Allan thought it was the Glock pistol, rather than the rifle.

Allan spent two minutes trying to push his way past defendant and eventually was able to make it out the door. Defendant followed them and started shooting at them from the front porch. Meanwhile, Allan, who was unarmed and scared, tried to get himself and Cheyenne into Cheyenne's car via the driver's side, but they did not both fit, so he headed toward the passenger side. At one point, he yelled at Erin to get in the car. Allan heard three to four shots and defendant saying, "What's up now?" Cheyenne later testified that Allan replied, "I'm from the east side," but Allan denied doing so during cross-examination. Defendant then shot Allan in the chest, and Allan fell to the ground. With Cheyenne's help, Allan was able to climb into the car. Cheyenne got back into the car and drove away to get help. Allan was hospitalized for two weeks due to his injuries.

B. *Testimony from Cheyenne*

Cheyenne testified during trial that Erin and defendant were in a romantic relationship and had lived together for a few years before the incident. At the time of trial, Cheyenne was still living with Erin. She did not know whether Erin was still dating defendant, testifying that was "her personal business."

The evening of the incident, Cheyenne was on the back patio when she noticed defendant and Allan talking alone inside the house. She heard a raised voice and then Allan came outside. Defendant also came outside, and a fight broke out. She and Erin stood up to try to break up the fight, but she fell down when Allan got knocked over into her. Allan stood up and resumed fighting with defendant. At some point, Allan broke defendant's glasses. The night of the incident, Cheyenne told police that defendant attacked Erin, Allan, and her. At some point during the fight, defendant went into the house and returned with a gun that looked like a rifle. Defendant fired a warning shot into the air. Erin told Allan and Cheyenne to leave. Cheyenne did not remember telling the police the night of the incident that defendant had hit Erin with the end of the gun. Cheyenne had had a lot to drink that night, but she stated she never saw a mark on Erin.

After Erin told them to leave, Cheyenne grabbed her keys and phone from inside and headed to her car. Meanwhile, defendant was inside his room, and Cheyenne and Allan left via the front door and ran toward her car. As they were getting in the car, defendant came outside. Allan got in the passenger side, but then got out and started arguing with defendant. Cheyenne only realized defendant had a handgun when she saw him fire at Allan. She could not remember if there was more than one shot fired. Cheyenne later testified that she heard defendant and Erin "arguing about [defendant having a gun in his hand]" while defendant was on the front porch. Cheyenne helped Allan up from the ground and into the car. Cheyenne testified she found Allan outside the gate of the home, but "[s]till in our driveway." She drove Allan to the hospital.

The jury heard a recording of Cheyenne's interview with police at the hospital the night of the incident. During the interview, Cheyenne told police defendant and Allan got into an argument. Allan said they would leave, but defendant attacked Allan, Erin, and Cheyenne. Cheyenne said defendant hurt her face and back, and her nail was broken. Although defendant only used his hands at first, at one point he retrieved a "really big gun" and hit Erin with the butt end of the gun.

4

Cheyenne told police that she said she and Allan would leave, and the two headed out front to her car. Defendant followed them out to the front porch and shot at them with a smaller gun while Allan was trying to get into the car. Allan was hit and fell to the ground. Defendant was only 10 to 15 feet away when he shot at them and hit Allan.

After listening to the recording at trial, Cheyenne testified she still did not remember defendant hitting Erin with the gun. Cheyenne said she remembered telling what she "thought was the truth" to the officer.

C.    *Police testimony*

An investigating officer testified he searched Erin's home after the shooting and found multiple firearms, including two AR-15 rifles and a handgun in the bedroom and a .22-caliber rifle in another bedroom. He also found a case and a magazine for a .45-caliber Glock. In addition, he found one expended .45-caliber casing on the back porch, and another on the front porch. An AR-15 rifle could not fire a .45-caliber bullet.

Another officer testified that the day of the shooting, defendant was at the sheriff's office for an interview. Defendant received a call on his cell phone from an unknown woman. She asked what was going on, and defendant said, "I don't know stuff with the ex. Her and her daughter thought that they could put their hands on me, and yeah, um I think I might have shot the daughter's boyfriend, not sure." A recording of the call was played for the jury.

D.    *Defense counsel's attempts to introduce evidence of Allan's alleged racial bias and alleged domestic violence incidents between Allan and Cheyenne*

During cross-examination of Allan, defense counsel attempted to admit a March 2020 text message between Allan and Erin wherein Allan told Erin to back off and called her a "[racial epithet] lover." Defense counsel asked Allan if he had referred to defendant with a racial epithet, and the trial court sustained the prosecutor's objection based on relevance. In a bench conference, defense counsel argued the message was relevant

5

character evidence under Evidence Code section 1103.[2]  According to counsel, the text message should be admitted because it established Allan's racism and could show Allan was more likely to behave violently during the incident.  Defense counsel further argued Allan's racism could show he had an incentive to lie during testimony.  The prosecutor objected, stating he had never seen the document before, that it contained hearsay, and that it was more prejudicial than probative.  (Evid. Code, § 352.)  The trial court admonished defense counsel for failing to provide the document to the prosecutor before trial.  In addition, the trial court reasoned that defendant had failed to show the statement's relevance.  Although the statement established Allan had insulted Erin during an argument via text message after the incident, it did not establish that Allan harbored racial animus toward defendant, nor that he acted in a racist manner during the commission of the crime or had a trait of being violent due to racial bias.  Given the minimal relevance to defendant's theory of self-defense and "wildly inflammatory" nature of the statement, the trial court excluded the statement under Evidence Code section 352.

During a bench conference in the middle of Cheyenne's testimony, defense counsel indicated he wanted to ask whether there were any incidents of domestic violence between Cheyenne and Allan, based on Cheyenne's testimony that Allan yelled at her to move over when they were trying to get in the car and flee.  The prosecutor argued such evidence was prejudicial and irrelevant.  The trial court reasoned that it was

---

[2]      In relevant part, Evidence Code section 1103 provides:  "(a) In a criminal action, evidence of the character or a trait of character (in the form of . . . evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is:  [¶]  (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  (Evid. Code, § 1103, subd. (a)(1).)  With respect to its analysis under Evidence Code section 1103, the trial court reasoned the text message would be evidence of a specific instance of conduct.

understandable for Allan to yell at Cheyenne during the stressful evening, and this did not establish a history of violence. Defense counsel indicated there was a text message between Allan and Erin suggesting Allan might have "put his hands on" Cheyenne. The trial court indicated counsel should have investigated this issue before trial and held it was not an appropriate use of the jury's time to ask about these issues at trial, even if the questioning occurred outside the jury's presence.

E. *Closing argument*

During closing argument, defense counsel argued the prosecution bore the burden of proof and noted that "neither side is required to call all witnesses who may have information about the case or to produce all physical evidence." Still, there was an "elephant in this room," namely, that the prosecution had failed to call Erin, despite her having witnessed the incident and being a named victim. Counsel reminded the jury that it was not his obligation to call Erin.

Defense counsel then argued that Cheyenne's testimony supported defendant's self-defense theory because Allan had yelled, "I'm from the east side." Defense counsel acknowledged "[w]e don't know what that testimony means," but encouraged the jurors to use their common sense to figure out Allan's meaning. Counsel further argued defendant's glasses were broken, it was 3:00 a.m., and Allan was yelling at him. Even though Allan said he was unarmed, it was possible he was not. Given that Allan had yelled a threatening statement, counsel argued defendant acted reasonably when he fired shots to the side (although one of those shots hit Allan).

In contrast, the prosecutor argued the jury should credit Cheyenne's statement to police at the hospital over her trial testimony, saying, "Cheyenne seemed like she had a little bit of a truthfulness problem." Cheyenne sounded sober during the taped statement, suggesting she was telling the truth. Moreover, her motives at trial were mixed, given that she was still living with Erin in the home that Erin shared with defendant.

7

The prosecutor also argued defendant had not acted in self-defense because he could "only pursue a person if that is reasonably necessary. Shooting an unarmed twenty-three, twenty-four-year-old kid is not reasonable. He was shot off of the property. He was shot outside the fence. Defendant is still arguing with Erin. She is telling him to put down the gun. He decided to point a gun at Allan and pull the trigger. The only reason to point a gun at someone and pull the trigger is because you are trying to kill them."

F.      *Verdict and sentencing*

The jury found defendant guilty of attempted murder (§§ 664, 187—count 1); assault of Allan with a semiautomatic firearm (§ 245, subd. (b)—count 2); assault of Erin with a firearm (§ 245, subd. (b)—count 3); unlawful possession of an assault weapon (§ 30605—count 4); and misdemeanor assault of Cheyenne (§ 242—count 5). The jury found the following enhancements to be true: personal discharge of a firearm and proximately causing great bodily injury as to count 1 (§ 12022.53. subd. (d)); personal use of a firearm as to counts 1 through 3 (§ 12022.5, subd. (a)); and infliction of great bodily injury as to counts 1 and 2 (§ 12022.7).

In April 2020, defendant asked the court to strike the section 12022.53, subdivision (d) firearm use enhancement, or modify it so as to impose a lesser included offense. Defendant noted he was only in his thirties at the time of the incident and had only one prior criminal conviction as an adult, which was a nonviolent misdemeanor. Defendant also noted he had a 12-year-old child, and was gainfully employed at the time of the incident.

During the April 2020 sentencing hearing, Erin told the court that defendant never hit her in the face, as evidenced by the lack of any marks on her. She thought the potential sentence was too long, given that defendant had been "attacked in his own home" by Allan, who was under the influence of alcohol and drugs, and was acting like a "lunatic." She argued defendant did not intend to shoot Allan, as shown by the fact that

8

defendant had multiple opportunities to shoot him but refrained. According to Erin, the only reason defendant shot Allan after he got out of the car was because he feared Allan had retrieved a gun from the car. Allan also threatened defendant after exiting the car. Erin asked why Allan, whom she had known for eight years, had not taken any responsibility for the incident, and she accused Allan's family of harassing her and threatening her job.

Overall, Erin felt the case was "poorly handled" and that defendant had received "poor representation." Although she had been previously subpoenaed by the prosecution, she received no subpoena for the actual trial. In her opinion, the prosecutor did not call her as a witness because she "would have destroyed their case." She stated defense counsel and the investigator told her that the prosecutor had a "mark out for [defendant] for some reason." She asked defense counsel to call her as a witness, but he declined because "it wasn't his job to prove [defendant's] innocence," and the prosecutor bore the burden of proving defendant's guilt. Erin also submitted a written character reference.

After hearing from Erin, the court commented, "We certainly cannot guess, [Erin], as to why you did not testify. It's an interesting way to go about things when someone is actually here." Regardless, the jury was the trier of fact and had reached its decision, and the court "saw nothing unfair about how the evidence was presented or how the arguments were made . . . ."

The court noted it had considered defendant's points and authorities regarding his request to strike or modify the section 12022.53, subdivision (d) firearm use enhancement. The court noted it would decline to do so because the shot was made from a distance, making the enhancement "consistent" with the charges.

Turning to sentencing, the court discussed whether the circumstances in mitigation outweighed those in aggravation. Although defendant and Allan had argued, Allan had decided to leave and was trying to do so. Still, defendant had a minimal criminal history

as an adult, and the circumstances of defendant's crime were not more serious than other similar cases.

The court then sentenced defendant to state prison for an aggregate term of seven years plus 25 years to life, as follows: (1) five years for the attempted murder count (§§ 664, 187), plus 25 years to life for the gun use enhancement (§ 12022.53, subd. (d)), three years stayed under section 654 for the great bodily injury enhancement (§ 12022.7) and four years stayed under section 654 for the gun use enhancement (§ 12022.5, subd. (a)); (2) six years stayed under section 654 for the assault of Allan with a semiautomatic firearm count (§ 245, subd. (b)), plus three years stayed under section 654 for the great bodily injury enhancement (§ 12022.7); (3) two years consecutive (one-third the midterm) for the assault of Erin with a firearm count (§ 245, subd. (b)), plus four years stayed under section 654 for the firearm use enhancement (§ 12022.5, subd. (a)); and (4) two years concurrent for the unlawful possession of an assault weapon count (§ 30605). The trial court orally imposed various fines and fees, including $90 in assessed fees (Gov. Code, § 70373). The abstract of judgment, however, lists $150 in assessed fees.

## DISCUSSION

### I

Defendant contends the evidence was insufficient to support his conviction for assaulting Erin with a firearm. According to defendant, testimony from Allan and Cheyenne that defendant hit Erin with a gun must be disregarded because it is inherently improbable and demonstrably false. Defendant argues that Allan's testimony was fabricated because he waited until redirect testimony to say that defendant hit Erin with the Glock. Defendant argues it would have been impossible for defendant to use the Glock to hit Erin on the back porch, since Allan testified that he only saw defendant with the rifle on the back porch. Moreover, it would have been impossible for defendant to hit

10

Erin with the gun while he was on the front porch, since both Allan and Cheyenne testified that defendant only fired the Glock while he was on the front porch.

Defendant further argues the verdict is questionable because the prosecutor (1) failed to call Erin as a witness, and (2) erroneously discussed the unanimity instruction during closing argument in connection with count 3 (i.e., the assault of Erin with a firearm), rather than with count 2 (i.e., the assault of Allan with a semiautomatic firearm). We reject defendant's invitation to reweigh the persuasiveness of the evidence and find his contentions without merit.

A.      *Additional background*

During closing argument, the prosecutor stated: "When returning to the assault on Erin with the firearm, you have an unanimity instruction. Allan says he saw Erin get hit with the Glock. Cheyenne says to [the officer at the hospital] that she saw her mom get hit with the butt of the rifle. You can agree that it was both of those things. Obviously you can find that it was either of those things. Where unanimity comes in is if six of you say I believe . . . Erin was hit with the Glock and the other six say it was the assault weapon, that doesn't work. You all have to agree as to at least one of them . . . . [¶] Pistol whipping, hitting someone with a firearm is also an assault with a firearm. It doesn't need to be a shot. That also applies to the special allegation [under section 12022.5], use of a firearm. Displaying it for that is enough in a menacing manner. Shooting it, of course, and also using it as a bludgeoning impact tool."

The jury was given a unanimity instruction per CALCRIM No. 3500 with respect to count 2.**3**

---

**3**      Specifically, the jury was instructed as follows: "The defendant is charged with assault with a semiautomatic firearm in Count Two. The people have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless all of you agree that the people have proved that the

B.     *Analysis*

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  The "testimony of a single witness is sufficient to support a conviction" unless it is physically impossible or inherently improbable.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"].)

Despite defendant's contentions, Cheyenne's statement to police just after the incident that defendant hit Erin with the butt of a "really big" gun constituted sufficient evidence to support his conviction for assaulting Erin with a firearm.  Further, while

defendant committed at least one of those acts and that you all agree on which act he committed."  (CALCRIM No. 3500, as given.)

defendant argues that it would have been impossible for defendant to use the Glock to hit Erin on the back porch, given that Allan testified that he only saw defendant with a rifle on the back porch, the evidence showed that sheriff's deputies found an expended .45-caliber casing on the back porch, supporting the inference that the Glock pistol was present in that location. There may have been some conflicting evidence presented at trial, including Allan's testimony that he thought defendant hit Erin with a Glock (rather than a "really big" gun), and Cheyenne's testimony that she did not remember defendant hitting Erin with the gun. Still, these conflicts do not rise to the level of making Cheyenne's statement to police physically impossible or inherently implausible. It was up to the jury to determine which version of events they found credible, and a jury could reasonably infer from all the evidence presented that defendant hit Erin with a firearm during the fight, especially since the unanimity instruction was only given with respect to count 2.

Given that evidence from one witness is sufficient to prove any fact (Evid. Code, § 411), it is immaterial that the prosecution did not call Erin as a witness. For similar reasons, the fact that the prosecutor may have misstated the applicability of the unanimity instruction is also immaterial as to whether there was sufficient evidence to support defendant's conviction on count 2, especially since defendant does not contend the prosecutor committed misconduct.

## II

We turn next to defendant's argument that he received ineffective assistance of counsel. According to defendant, his theory of the case was imperfect self-defense, and the jury was instructed on heat of passion and imperfect self-defense. However, argues defendant, his counsel failed to present evidence to support the theory. Specifically, defendant argues his counsel erred in failing to call Erin as a witness. Pointing to Erin's statements during the sentencing hearing, defendant argues Erin could have helped (1) establish his theory that he was acting in imperfect self-defense, and (2) defendant

13

never hit her with a gun. Defendant notes that during closing argument, his counsel explained that defendant did not bear the burden of proof and therefore the jury should not blame defendant for the failure to have Erin appear as a witness. Defendant also argues Erin could have testified about Allan's racial bias, especially as it related to her relationship with defendant. In addition, Erin could have testified about alleged incidents of domestic violence between Allan and Cheyenne.

Defendant also argues that his counsel was ineffective because he failed to adequately investigate potential impeachment evidence against Allan. According to defendant, the text message between Allan and Erin wherein Allan used a racial epithet should have led his counsel to perform a more thorough investigation of Allan, especially since defense counsel also suspected domestic violence between Allan and Cheyenne. Defendant also argues his counsel should have called Erin as a witness to help impeach Allan.

In addition, defendant argues his counsel demonstrated a lack of knowledge as to evidentiary issues. Specifically, defendant contends his counsel erred in seeking to admit the text message with the racial epithet under Evidence Code section 1103, rather than Evidence Code section 780.[4] He further contends his counsel "failed to lay a proper foundation for the evidence by first questioning Allan whether he is racially biased against mixed race couples [like Erin and defendant], and whether he bore animus against [defendant] in particular, based upon [defendant's] relationship with Erin." Despite the fact that the court ultimately found the text message evidence inadmissible based on

---

[4] As relevant here, Evidence Code section 780 provides: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subd. (f).)

relevance and prejudice, defendant further contends counsel should have argued he had no obligation to produce the text message prior to trial.

Defendant next contends his counsel erroneously failed to object to the prosecutor's closing argument. Specifically, defendant contends his counsel erred in failing to object to the prosecutor's misstatement regarding the unanimity instruction and count 3 (the assault on Erin with the firearm) during closing argument. Defendant also argues his counsel should have objected to the prosecutor's questioning of Cheyenne's credibility, arguing the prosecutor was improperly vouching for Allan's credibility, even though Allan's version of events was demonstrably false.

Finally, defendant contends his counsel should have objected when the prosecutor added "facts" which were not adduced during the presentation of evidence. According to defendant, the prosecutor erroneously stated that Allan was shot "off of the property," despite Cheyenne's testimony that Allan was still in the driveway when defendant shot him. Defendant further argues that the prosecutor erroneously stated that Erin told defendant to "put down the gun," even though Cheyenne only testified that she believed Erin and defendant were arguing about the gun, but she could not hear them clearly.

Finally, defendant argues he was prejudiced by defense counsel's cumulative errors. We find defendant's contentions without merit.

A.     *Applicable standard of review*

To establish a claim of ineffective assistance of counsel, a defendant must prove that (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in prejudice to defendant, meaning there is a "reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *id*. at pp. 1009-1010; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 [80 L.Ed.2d 674, 693, 698].)

15

Further, because it is inappropriate for a reviewing court to speculate about the tactical reasons for counsel's actions, when the reasons are not readily apparent in the record, the court will not reverse unless the record discloses no conceivable tactical purpose. (*People v. Lewis* (2001) 25 Cal.4th 610, 674-675.) If the record sheds no light on the reasons for counsel's actions, a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

A claim that counsel should have called additional witnesses at trial " 'must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations.] We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

Similarly, when an ineffective assistance claim is based on a failure to investigate, the defendant must show more than a defense counsel's failure to interview or call available witnesses. (*People v. Knight* (1987) 194 Cal.App.3d 337, 345.) Instead, a defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense," and that counsel's omission was not attributable to a reasonable tactical decision. (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.)

B.     *Defense counsel's decision to not call Erin as a witness and investigation of impeachment against Allen*

Despite defendant's contentions, the record does not establish why defense counsel failed to call Erin as a witness. Although defense counsel suggested during closing argument that the jury should not blame defendant for Erin's absence because defendant did not bear the burden of proof, and Erin made a similar statement during the sentencing hearing, such arguments do not definitively establish that this was defense counsel's sole reason.

16

In addition, the record is silent as to the extent of defense counsel's investigation. It is possible defense counsel interviewed Erin and found her to be uncredible or unreliable, especially since Erin and defendant were in a romantic relationship and owned a home together. Erin also could have said things during the investigation that led defense counsel to conclude Erin's testimony would not have helped impeach Allan or otherwise helped defendant establish his defense. For example, Erin, who had known Allan for eight years, may have been unaware of any prior incidents of racial bias or domestic violence that were of such a nature as to establish that Allan had a proclivity for violence or harbored racial animus against defendant. It is also unclear whether defense counsel could have obtained such evidence from other witnesses such as Cheyenne. Also, the record does not establish that such evidence would have been helpful in impeaching Allan since the trial court sustained the prosecutor's objection and Allan never had the opportunity to answer whether he referred to defendant with a racial epithet.

Moreover, the record is unclear as to what Erin would have testified to under oath during trial. Although Erin's statement during the sentencing hearing (which took place two months after trial) might have contained helpful evidence for defendant, she did not make the statement under oath. It is possible she would not have given the same testimony under oath and subject to cross-examination at trial, especially since her goal during the sentencing hearing was to elicit the trial court's leniency. Given that the record fails to establish that defense counsel (1) undertook an insufficient investigation, and (2) had no conceivable tactical purpose for failing to call Erin as a witness, we must reject defendant's claims. (See *People v. Lewis, supra*, 25 Cal.4th at pp. 674-675.)

C.      *Defense counsel's decision regarding evidentiary issues*

With respect to defendant's contentions that his counsel should have argued Allan's text message to Erin was admissible under Evidence Code section 780, we note that defense counsel argued that the evidence could show Allan was racially biased

17

against defendant and therefore he had an incentive to lie or embellish during his testimony. The court considered this argument and ultimately held the statement was referring to Erin, rather than defendant, and thus was not relevant as to Allan's motives during testimony. Given the court's findings, it would have been futile for defense counsel to make further supporting arguments. (*People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)

Turning to defendant's contention that his counsel should have laid a better foundation for the relevance of the text message as impeachment evidence, his argument hinges on Allan denying that he had a racial bias against mixed-race couples or defendant due to his relationship with Erin. We decline defendant's invitation to speculate as to how Allan would have answered such questions. Under the circumstances, defendant cannot establish prejudice and his contentions are without merit. (See *People v. Mai, supra*, 57 Cal.4th at pp. 1009-1010.)

With respect to defendant's contention that his trial counsel should have argued that he did not have an obligation to produce the text message before trial, we note that the trial court ultimately held the evidence to be inadmissible because it was more prejudicial than probative. (Evid. Code, § 352.) Because the court did not exclude the statement based on any discovery violation, defendant cannot establish any prejudice and his contentions are without merit.

D. *Defense counsel's failure to object to the prosecution's closing argument*

Although the prosecutor misspoke when he said during closing argument that the unanimity instruction applied to count 3 (the assault on Erin with the firearm) rather than count 2, defendant's claims fail because he cannot establish prejudice. On appeal we presume the jury followed the court's instructions (which correctly identified the proper applicable count) rather than relying on a brief extraneous remark by counsel. (*People v.*

18

*Boyette* (2002) 29 Cal.4th 381, 436; see also *People v. Najera* (2006) 138 Cal.App.4th 212, 224 [where there is any conflict between counsel's argument and the court's instructions, courts presume the jury followed the instructions]; *People v. Morales* (2001) 25 Cal.4th 34, 47 ["we presume that the jury relied on the instructions, not the arguments, in convicting defendant"].) Moreover, defendant fails to identify how he could have benefitted from any objection, since the prosecutor's version would have made it more difficult to convict defendant of count 3 because the jurors would have had to agree about which gun defendant used to hit Erin. (See *People v. Price, supra*, 1 Cal.4th at p. 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)

For similar reasons we also find without merit defendant's argument that the prosecutor improperly vouched for Allan's credibility and his counsel should have objected. In support of his assertion that "Cheyenne seemed like she had a little bit of a truthfulness problem," the prosecutor relied on facts in the record, namely, that Cheyenne had sounded sober during the taped statement at the hospital, and her motives at trial were mixed because she was still living with Erin. A prosecutor has wide latitude to argue his case and may comment on a witness's credibility based on the facts in the record and the inferences reasonably drawn therefrom. (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) Under the circumstances, defense counsel was not deficient for failing to make a meritless objection. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 [trial counsel's representation is not deficient "for failing to make meritless objections"].)

We also find no merit in defendant's contention that his counsel should have objected to allegedly erroneous facts in the prosecutor's closing argument. Although it is misconduct for a prosecutor to mischaracterize evidence, prosecutors have wide latitude to draw inferences from the evidence presented at trial. (*People v. Hill* (1998) 17 Cal.4th 800, 823.) Here, the prosecutor briefly mentioned that Allan was off the property when he was shot, but the prosecutor immediately followed up with the explanation that Allan

19

was actually outside of the house gate. This did not contradict Cheyenne's testimony that she found Allan on the driveway but outside the gate of the home, and went to the prosecutor's larger point that defendant could not establish imperfect self-defense when he shot Allan from a distance. Further, Cheyenne testified that she heard defendant and Erin arguing about defendant having a gun in his hand while defendant was on the front porch. As such, it was not error for the prosecutor to infer and argue that Erin was telling defendant to put the gun down. Since any objection would have been meritless, defense counsel's performance was not deficient. (See *People v. Ochoa, supra*, 19 Cal.4th at p. 463.)

Given our conclusions, we reject defendant's argument that his counsel's cumulative errors resulted in prejudice.

### III

We turn next to defendant's argument that the trial court abused its discretion in failing to strike the section 12022.53, subdivision (d) firearm enhancement, or to modify the conviction and instead impose the section 12022.5, subdivision (a) firearm enhancement. According to defendant, the court should have been persuaded by evidence that the jury did not hear when it was considering the enhancement, namely, that Allan harbored racial bias and had likely committed domestic violence against Cheyenne. In addition, defendant points to Erin's statement during the sentencing hearing, which he argues proves defendant harbored a reasonable belief that he needed to protect himself and Erin after Allan went to the car and had the opportunity to retrieve a gun.

Section 12022.53, subdivision (d) provides that any person who personally and intentionally discharges a firearm and proximately causes great bodily injury or death to any person other than an accomplice in the commission of a specified felony shall be punished by an additional term of imprisonment in state prison for 25 years to life. One of the specified felonies is attempted murder. (*Id*. at subd. (a)(1) & (18).) However,

20

subdivision (h) allows the court to, "in the interest of justice pursuant to Section 1385 . . . , strike or dismiss an enhancement otherwise required to be imposed by this section." Defendant argues the trial court abused its discretion in refusing to strike the enhancements or impose lesser uncharged and unfound enhancements pursuant to sections 12022.53 and 12022.5.

" '[A] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 373.)  A " ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.]" (*Id.* at p. 377.)  " 'A trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*People v. Stuart* (2007) 156 Cal.App.4th 165, 179.)  Absent an indication to the contrary, we presume the trial court considered all relevant facts and arguments.  (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 447; *People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

In determining whether to strike enhancements, a trial court is to consider the factors enumerated in the California Rules of Court[5] relating to general sentencing objectives and aggravating and mitigating factors.  (*People v. Pearson* (2019) 38 Cal.App.5th 112, 117.)  General sentencing objectives include protecting society, punishing the defendant, deterring future offenses by others, preventing defendant from committing new crimes, and achieving uniformity in sentencing.  (Rule 4.410(a)(1), (2), (4), (5) & (7).)  Aggravating circumstances include:  the crime involved threat of great bodily harm, and the defendant was armed with or used a weapon during the commission of the crime.  (Rule 4.421(a)(1) & (2).)  Mitigating circumstances include:  the victim

---

[5]     All rule references are to the California Rules of Court.

was a willing participant in, or provoked, the incident, and the defendant's minimal or lack of prior criminal record. (Rule 4.423(a)(2) & (b)(1).)

As to both the issue of striking the firearm enhancement or reducing it to a lesser uncharged enhancement, the record reflects that the trial court considered the probation report, defendant's brief regarding the enhancement, and the parties' arguments at the hearing. The court acknowledged defendant's minimal prior criminal history and the fact that the crime was not more serious than other similarly charged crimes. It also acknowledged Erin's statement during the sentencing hearing about Allan's alleged actions during the incident. Still, the trial court noted that any mitigating evidence was outweighed by the fact that the gunshot was made from a distance, making the enhancement "consistent" with the charges and enhancement. These comments suggest the court was also considering general sentencing principles.

Defendant argues the trial court should have imposed a lesser firearm use enhancement, even though he acknowledges that the law is unsettled as to whether the trial court had authority to modify the enhancement where there is no jury finding on a subdivision imposing a lesser sentence. (See, e.g., *People v. Delavega* (2021) 59 Cal.App.5th 1074, 1084, review granted Apr. 14, 2021, S267293 [noting it is undisputed that if all of the possible section 12022.53 enhancements are charged and separately found true, the trial court can strike the greater enhancement and impose the lesser enhancement, but there is currently a split among the appellate courts as to whether a trial court can do so if the lesser enhancements are not charged and found true].) Regardless, the trial court noted it had considered defendant's request "in light of [the] law which allows the Court . . . [to] modif[y] those enhancements." We find no abuse of discretion.

IV

Finally, we note that the abstract of judgment lists $150 in assessments (Gov. Code, § 70373), despite the trial court orally imposing only $90 in assessments. Given that the court's oral pronouncement of judgment controls, we will order the abstract

22

corrected.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [the trial court's oral pronouncement of judgment controls, and courts must correct errors and omissions in abstracts of judgment].)

DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare a corrected abstract of judgment consistent with this opinion and to forward a certified copy to the Department of Corrections and Rehabilitation.


      KRAUSE      , J.


We concur:


      HULL      , Acting P. J.


      RENNER      , J.